```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
                     SOUTHERN DIVISION



UNITED STATES OF AMERICA,

               Plaintiff,

                                      HONORABLE NANCY G. EDMUNDS
        v.
                                      No. 21-cr-20285
LYNNIE ROBERSON,

               Defendant.
_____/



                      MOTION HEARING

          Detroit, Michigan - Thursday, June 30, 2022


Appearances:

Jerimiah Smith
United States Attorney's Office
Eastern District of Michigan
211 W. Fort, Suite 2100
Detroit, MI 48226
Email: jerimiah.smith@usdoj.gov
On behalf of Plaintiff

Maria Mannarino
500 Griswold Street, Suite 2430
Detroit, MI 48226
Email: mmannarino@comcast.net
On behalf of Defendant


                            -    -    -


          Suzanne Jacques, Official Court Reporter
            email: jacques@transcriptorders.com
```

```
                          Motion Hearing
                     Thursday, June 30, 2022



                         I N D E X

                         -    -    -
```

Proceeding                                          Page

Proceeding                                          Page

  Motion to Exclude Expert Testimony

    Proffer by Mr. Smith                            27

    Response by Ms. Mannarino                       28

    Rebuttal by Mr. Smith                           29

    Response by Ms. Mannarino                       30

  Motion Re: 404(b) Evidence

    Comment by Ms. Mannarino                        31

    Response by Mr. Smith                           31


Government's Case in Chief                          Page


Witness

Joseph Nether

      Direct Examination By Mr. Smith              5


  Certificate of Court Reporter                     33

Motion Hearing
Thursday, June 30, 2022

1    Detroit, Michigan

2    Thursday, June 30, 2022

3    1:30 p.m.

4                         -    -    -

5              THE CLERK:  Court calls 21-20285, United States

6    of America vs. Lynnie Roberson.

7              Counsel, state your appearances for the record.

8              MR. SMITH:  Good morning Your Honor.  Jerimiah

9    Smith on behalf of the United States.

10             MS. MANNARINO:  And good morning.  Maria

11   Mannarino on behalf of Mr. Lynnie Roberson, who is present

12   and stands to my left.

13             THE COURT:  Good morning, everyone.  Be seated

14   please.

15             You're welcome to remain seated when you address

16   the Court.  If it's easier for you to do that, it's fine.

17   I know some people prefer to speak from the podium, and

18   that's fine, too, just as long as you can use a mic.

19             And I think my law clerk has told you, anyone who

20   is vaccinated is welcome to take off their mask.

21             We have two motions up this morning.  Ms.

22   Mannarino, I believe they're both your motions.  Motion in

23   limine to exclude proposed 404(b) evidence, and a motion

24   to exclude expert testimony and for a Daubert hearing.

25   Let's start with 404(b).

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1      MS. MANNARINO:  At the Court's pleasure, but we

2   did discuss whether or not we could do the other motion

3   first, in order to accommodate the witness.

4      THE COURT:  That's fine.  Go ahead.

5      MR. SMITH:  I defer to you, ma'am.  Your motion,

6   as the Court indicated.

7      Your Honor, I'm prepared to call ATF Special

8   Agent Joe Nether to elicit testimony to lay the foundation

9   for his basis in expertise in narcotics trafficking.

10      THE COURT:  That's fine.

11      MR. SMITH:  Thank you.  The government calls

12   Special Agent Joe Nether.

13      THE COURT:  Raise your right hand, please.

14      Do you solemnly swear that the testimony you're

15   about to give in the matter here pending will be the

16   truth, the whole truth, and nothing but the truth, so help

17   you God?

18      THE WITNESS:  I do.

19      COURT REPORTER:  Spell your name, please.

20      THE WITNESS:  Joseph, J-o-s-e-p-h; Nether,

21   N-e-t-h-e-r.

22      MR. SMITH:  May I proceed, Your Honor?

23      THE COURT:  You may.

24

25

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1                         **DIRECT EXAMINATION**

2      BY MR. SMITH:

3      Q    Agent Nether, where are you employed?

4      A    I'm employed as a supervisory special agent with the

5      Bureau of Alcohol, Tobacco, Firearms and Explosives.

6      Q    Commonly referred to as the ATF, sir?

7      A    Yes.

8      Q    How long have you been with ATF?

9      A    Since the  year 2001.

10     Q    You mention that you're currently a supervisor.  What are

11     your day-to-day responsibilities in that job?

12     A    As a supervisor, I run a team of approximately six to

13     seven people that work their investigations typically on the

14     west side of Detroit.  So we do anything from investigating

15     violent street gangs, to armed drug dealers, to shooters, by

16     doing CI buys, search warrants, things of that sort.

17     Q    Special Agent Nether, prior to being in this supervisory

18     position, what type of investigations were you conducting for

19     the ATF?

20     A    Prior to being a supervisor, my main type of

21     investigations involved racketeering cases against violent

22     street gangs in and around the City of Detroit, armed drug

23     dealers, drug dealers that robbed other drug dealers, armed

24     robbery crews.  I worked murder for hire investigations, just

25     simple drug organizations, violent felons that possessed guns.

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   Q    Before we get into some of those specifics, I want to take

2   a step back then.  What if any formal education do you have,

3   sir?

4   A    I have a bachelor's degree from the University of Detroit

5   Mercy.

6   Q    You mentioned some of the investigations that you've been

7   part of.  I think it's fair to say that we all know today we're

8   here to talk about potential narcotics trafficking, as well as

9   the use of firearms involved in alleged narcotics trafficking.

10  So let me ask you this, sir, what specific training have you

11  received as an ATF agent in the areas of investigating

12  narcotics trafficking?

13  A    Well, every agent, to include myself, does receive basic

14  narcotics and firearms training in the ATF Academy.  I've also

15  gone on to go to a firearms trafficking school.  Soon after I

16  got out of the academy, a couple years in getting out of the

17  academy, I've also been to a basic identification of narcotics

18  school for several days.  I've also been in another narcotics

19  identification class when I was a member of the enhanced

20  undercover program.  And then, in addition to that, obviously,

21  real world experience which I believe is more important than

22  what I learned in the classroom.

23  Q    Before we get into that real world experience, let's talk

24  a little more about some of the training that you just

25  mentioned.

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1          These narcotics, specifically, schools, when

2   you're going through this program, are you instructed on the

3   importance of things such as the weight of narcotics that you

4   might be dealing with?

5   A    Yes.

6   Q    Why is that important to you as an investigator?

7   A    Well, the importance when it comes to the weights are to

8   be able to distinguish when you're dealing with somebody who is

9   a user of narcotics as opposed to somebody who is a distributor

10  of narcotics, because if you're in a undercover capacity, which

11  a lot of these trainings that I've gone to and taught at, we

12  are trying to portray ourselves a certain way, so you have to

13  understand the different weights; when something is considered

14  personal, when something is considered distribution level, and

15  even how to break that distribution level down to sales on the

16  street.

17          So it's something where you have to learn all

18  aspects of narcotics trafficking, from the user, to the person

19  who is actually trafficking in narcotics.

20  Q    Let me follow up on what you just mentioned there.  You

21  indicated that even for street level trafficking you have to

22  understand how those weights can break down.  How do you

23  differentiate between, say, a low level dealer versus maybe a

24  mid level street dealer, to someone who is much higher up in a

25  narcotics trafficking organization?

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1  A    A lot of times you can figure that out just, I mean, a

2  weight is a big determining factor, and how much the person is

3  actually trafficking.

4              A lot of the times, my job function was to

5  actually meet with narcotics traffickers and have conversations

6  with these narcotics traffickers, so I was able, based on

7  conversations and based on what I was purchasing, able to

8  determine where they would fit in that scheme of whether or not

9  they're low, mid or high level, because I've purchased anything

10  from pretending to be a user of narcotics, to being a mid level

11  trafficker or middle man, and I've also portrayed myself as a

12  large scale distributor dealing with kilograms of cocaine.

13  Q    Again, before we get into that specific experience, I want

14  to touch on one more piece of your training.  You mentioned

15  that you have been part of the enhanced undercover program, is

16  that correct, sir?

17  A    That's correct.

18  Q    What type of training did you receive from that program

19  that would be relevant to our discussions today?

20  A    So I was in that program from 2016 to 2018.  Prior to

21  being a member of that program, I went to an advanced

22  undercover school where all of the, I guess, top undercover

23  agents from the country would come in to teach that school, and

24  they would put us through different scenarios.  Each

25  scenario -- well, most of the scenarios were related to a drug

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1    dealer that had a firearm, and how to purchase narcotics from

2    that drug dealer or from a narcotics -- or from a firearms

3    trafficker and how to purchase those narcotics -- or that

4    firearm from that trafficker.

5                Based on the individuals that were teaching that

6    school, they would actually set up the scenarios based on

7    actual events that they participated in, deals that they

8    actually did.  So every scenario that they would put us through

9    would actually be a real scenario.

10               Once you complete that advanced undercover

11   school, you are then given the opportunity to apply for the

12   enhanced undercover program, which I did.  And again, they put

13   you through more scenarios, they ask you a ton of questions.

14   They put you in a room where they have three experienced

15   undercover agents just fire questions as you, see how you'll

16   handle them.

17               And then typically, I mean, they're -- I think

18   when I went through there were probably about 20 people that

19   applied, and only three people made it through.  I was one of

20   those people.

21               When you answer the questions appropriately,

22   that's when you're given the opportunity to be in the program.

23   Then, once you're in the program, you are still required to go

24   through a training once a year where you again discuss

25   narcotics trafficking, firearms trafficking, the different

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1    types of methods utilized by different drug traffickers,

2    firearms traffickers.  It's to keep you up to date on what's

3    going on.

4                    And you're meeting with individuals from around

5    the country.  At any time, there's probably 25 to 30 different

6    agents that are in this program in different divisions around

7    the country, so you are learning the different methods that are

8    happening in all these different states and divisions, and

9    that's something that, for the most part, we went through every

10   year.  There were a couple that were missed based on funding,

11   but I've participated in several of those trainings.

12   Q    Would it be fair to say that after your practical

13   experience working as an undercover officer that you've also

14   now instructed at some of these schools?

15   A    Yes, I've been instructing for years now at the Advanced

16   Undercover School, which is where, like I mentioned, the school

17   prior to you getting into the undercover program.  It's the

18   school where -- it's individuals that are already doing

19   undercover work, but we then go in and teach them and view them

20   doing scenarios, and critique them on different things that

21   they could do.  And I, myself, have also come up with scenarios

22   based on real events that have taken place in my work to put

23   them through those scenarios.

24                    So yes, I've been doing that training for -- I've

25   been training definitely for over a decade.

Case No. 21-CR-20285

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1    Q     Why, then, based on your experience as a student, as well

2    now as an instructor, are these scenarios involving narcotics

3    trafficking consistently also involving firearms?

4    A     Because typically any narcotics trafficker that we are

5    investigating, they typically have firearms, and if they did

6    not have firearms, we would not be investigating them.

7    Q     During the course of these trainings, did you learn

8    certain methods that you've applied in these undercover

9    operations?

10   A     Absolutely.

11   Q     Do you learn things like how to conduct an undercover buy

12   of narcotics?

13   A     Yes, you learn what to say, the different terminology, the

14   prices that you should pay for certain weights of narcotics.

15   You -- because you're speaking with agents that are doing

16   things in other divisions, so we're able to bounce ideas off of

17   each other.  I'm able to explain what I've seen, they're able

18   to explain what they've seen.  So it's a way for us to stay on

19   top of what's happening when it comes to the world of narcotics

20   trafficking or armed narcotics trafficking.

21              And obviously, in addition to that, it's, you

22   know, we speak with our informants, as well, to make sure we're

23   up on what's going on in the areas that we work.

24   Q     I'll ask you to expound on that briefly.  When you speak

25   with an informant, what do you learn from them that might be

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1   relevant to why we're here today?

2   A    So sometimes, you know, prices change, sometimes the

3   method in which -- and how people conceal narcotics change, the

4   different types of firearms that people sometimes would

5   traffic, a popular gun or the type of gun that would be used

6   for narcotics trafficking.  I mean, sometimes those things

7   would change not too much, but those will be things that we

8   would debrief an informant on during each investigation once an

9   informant tells us about somebody who is allegedly involved in

10  narcotics trafficking just so we are up to date and making sure

11  that when we're investigating it that we're not doing anything

12  that would -- or that we would be doing things consistent with

13  how that person is operating.

14  Q    I'll ask you, then, a hypothetical.  For example, would a

15  debrief include something along the lines of how much currently

16  a heroin user is buying a half a gram of heroin for in the

17  greater Detroit area?

18  A    So it could, because a lot of the times when we are

19  dealing with informants and we're having the informants make

20  the buy, we are typically having the informants buy user

21  amounts, and they're not typically portraying a drug

22  trafficker.  It happens, but the majority of the time it's

23  going to be on a user level, and the reason that is, a lot of

24  informants that we are using are either former users of

25  narcotics or currently users of narcotics, and so that's kind

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   of the position that they're in.

2          The times where we would -- the majority of the

3   times where we would then start purchasing more of -- more of

4   the trafficking level, or portraying a drug dealer, we would at

5   that point, not all the time, but typically we would have the

6   informant introduce an undercover, and that undercover would

7   try to purchase more narcotics to look more like they were on

8   the distribution level.

9   Q    Thank you.  Now let's talk about some of your specific

10  experience with buying these.  Would it be fair to say that

11  you've been assigned to specific identifiable units that have

12  investigated low to mid level drug traffickers?

13  A    Yes.  Shortly after coming out of the academy, I was

14  assigned to the Downriver Area Narcotics Organization.  I did

15  that for approximately two and-a-half years starting in 2002.

16         I was also on another task force that also dealt

17  with low level to mid level narcotics traffickers called the

18  CAT team out of Washtenaw County which was the Community Action

19  Team.  I was actually on the ground level and helped create

20  that task force.  That's still in existence today.

21  Q    And the DRANO, the Downriver team you mentioned, that's

22  one of the Michigan State Police multi-jurisdictional task

23  forces, is that correct?

24  A    That's correct.

25  Q    That was from approximately 2003 to 2005?

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1    A    Yes, it spanned about two and-a-half years.

2    Q    When you were operating in that capacity, Special Agent

3    Nether, did you personally conduct undercover buys of

4    controlled substances?

5    A    I did.

6    Q    When you were operating in that capacity, did you also

7    oversee, as a supervisory agent, controlled purchases by

8    confidential informants?

9    A    Not as a supervisor role, but I participated as a team

10   member that oversaw CI buys and UC buys of narcotics.

11   Q    Were you involved in the debriefing of users of controlled

12   substances?

13   A    Yes.

14   Q    Were you also experienced, or did you receive experience

15   as a result of your investigations, in interviewing low to mid

16   level narcotics traffickers either prior or post their arrest?

17   A    Yes.

18   Q    Also during the course of these investigations did you

19   assist or lead, yourself as an officer in charge of a case, in

20   search warrants related to these investigations of low to mid

21   level dealers?

22   A    Yes.

23   Q    Turning your attention, then, to the CAT team you

24   mentioned in Washtenaw County.  Did you have any experience

25   when you were in that position with undercover purchases?

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   A     Yes.

2   Q     What types of drugs do you recall did you purchase when

3   you were in Washtenaw County?

4   A     Crack cocaine, cocaine, heroin, ecstasy, marijuana.  Those

5   are the different types of narcotics that I would personally

6   purchase when I was a member of that team.

7   Q     Let's talk about, again, that experience with any kind of

8   confidential informants and controlled purchases within -- did

9   you have experience with that with the CAT team?

10  A     Yes.  When I was involved with the CAT team, I did obtain

11  an undercover house, I wired up the house with video and

12  recording equipment and moved two confidential informants into

13  this house in the West Willow area of Ypsilanti, where the

14  informants on a daily basis would meet with both users and

15  dealers and record all of their interactions, and at times make

16  purchases from them of guns and drugs.

17  Q     As a result of this specific investigation, did you learn

18  information such as the importance of prices and how much users

19  were buying, what was an average use amount, things of that

20  nature?

21  A     Absolutely.

22  Q     Let's transition then to your experience in the Enhanced

23  Undercover Program for the ATF.  Did you operate in an

24  undercover capacity and purchase narcotics while acting in that

25  role?

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   A    Yes.

2   Q    Can you outline for the Court some of your experience in

3   the purchase of narcotics while operating under the EUP?

4   A    So some of the cases that I've been involved in as a

5   member of the EUP, Enhanced Undercover Program, I've worked in

6   multiple storefront locations, specifically like smoke shops,

7   running it as a business, working six to eight hours a day,

8   where on a daily basis I would be speaking with drug users,

9   drug dealers, gun traffickers, in different states.  One was in

10  Portland, one was in Georgia.

11            I actually operated a barber shop in the City of

12  Detroit on the west side of the city where, again, daily, I

13  would be speaking for hours on end with different users,

14  dealers, gun traffickers.  We would make purchases two to three

15  times a day, sometimes more.  I've also been tasked with going

16  to California in the Stockton, California area for four months,

17  where I did undercover, where I was part of a team of

18  undercover agents where we made six to eight purchases of drugs

19  and guns a day.  I would specifically be responsible for

20  probably about two buys every single day, Monday through

21  Friday.

22            I was in a storefront that was a clothing

23  store/tobacco shop in Louisville, Kentucky for six months where

24  I would work Monday through Friday, again buying from,

25  actually, in that location probably mostly low level

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1   traffickers as well as users that were trying to sell

2   narcotics, as well.  There was only a couple times where high

3   level traffickers or mid level traffickers came to that

4   location.

5              I've also portrayed myself as a multiple kilo

6   dealer as, I guess, a drug mule to infiltrate drug robbery

7   crews.  I've done at least 10 different cases where I've met

8   with robbery crews, that even times we've known these guys to

9   kill people to steal their narcotics, and I would basically

10  discuss with them robbing other dope dealers, drug dealers, and

11  we would arrest those individuals when they were conspiring to

12  rob those drug dealers.

13             I've participated as the UC on, in the City of

14  Detroit for narcotics crews that had 10-plus members.  One was

15  called the Joy Boys Crew, called the 952 Boys where I probably

16  arrested more than 10 individuals for selling directly hand to

17  hand with me crack cocaine.

18             Those are just some of the bigger cases, and I've

19  had a ton of a lot smaller cases where they're just, you know,

20  meeting with certain individuals that aren't necessarily part

21  of a drug crew or organization, but might be an individual

22  selling.

23  Q    Thank you.  I think we've outlined a pretty sufficient

24  basis as far as your general experience.  Let me ask you some

25  specifics.

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1        You just mentioned that in one of these positions

2   as a member of the Enhanced Undercover Program, that you were

3   buying mostly from either drug users or low level dealers, is

4   that correct?

5   A    Mostly, yes.

6   Q    What did you learn as to the common purchase or use

7   amounts by a drug user?

8   A    So typically, a drug user is going to purchase

9   approximately -- and this isn't going to be the same every

10  time, but approximately 0.2 grams of crack cocaine which would

11  be considered like one rock.  It could be a little bit smaller,

12  could be a little bit bigger.  That rock would be about $20.

13  It could be more depending on where you live, where you're

14  purchasing from, but that's what I learned would typically be a

15  user amount of narcotics.

16        Heroin would be around the same thing.  It could

17  be even a smaller amount.

18        And then, when it came to drug traffickers,

19  especially when I portrayed a drug trafficker, we would

20  typically start with purchasing maybe 3 grams of crack cocaine,

21  7 grams of crack cocaine, up to an ounce.  So typically my

22  purchases would be somewhere between 3 grams and an ounce when

23  I was trying to portray a drug trafficker.

24  Q    Few things that you mentioned there that I want to dig

25  into.  Let's talk about the average use amount first.  When you

1  indicate that the average user was purchasing about 0.2 grams,

2  when you have portrayed a user, did you purchase similar

3  amounts?

4  A    Yes.  I haven't portrayed a user all that often.  Just

5  based on my appearance, it is a little more difficult based on

6  what a user typically looks like that I've observed, but when I

7  have portrayed myself as a user, I have purchased as small as

8  one rock of crack cocaine or two rocks of crack cocaine, yes.

9  Q    Based on your own experience as well as your discussions

10  with drug users, why is it that users of crack cocaine only

11  purchase this, maybe, two tenths of a gram amount?

12  A    Well, crack cocaine is very addictive.  The high from

13  crack cocaine typically lasts 5 to 15 minutes, and the effects

14  of that high typically make that user want to get that high

15  again.  So typical users of crack cocaine have trouble holding

16  down jobs or any responsibility, and they usually spend all of

17  their money on narcotics, and if they can't come up with money,

18  they will trade whatever items they can in exchange for those

19  narcotics.  They will steal from family members to obtain those

20  narcotics.  So yeah, when it comes to a user, they're trying to

21  get their hands on whatever they can.

22  Q    You mention that when you were operating in a capacity as

23  a low level dealer, you purchased amounts ranging from 3 grams,

24  7 grams, to an ounce itself.  When you're dealing with

25  something like 3 grams of crack cocaine, is there even specific

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   terms or vernacular on the street that's used for that amount?

2   A    Well, I would call it a ball.  So which is like an eighth

3   of an ounce, and typically an eighth of an ounce is 3.5 grams.

4   That's when you're dealing with powder cocaine.  When you're

5   dealing with crack cocaine, it's 3 grams.

6          There's different weights for the different type

7   of narcotic, and it's just based off of the cutting agents and

8   what happens when you actually turn powdered cocaine into crack

9   cocaine.  So an ounce of powdered cocaine is 28.3 grams, but if

10  you're purchasing an ounce of cocaine, it's typically about 24

11  grams for the crack cocaine because a few grams burn off.  So

12  yeah, it would typically be about 3 grams, and the terminology

13  would usually be a ball.

14  Q    In this instance, we have approximately 7.5 grams of crack

15  cocaine.  Would there be a type of term or specific way you

16  might request that if you were acting as either a user or a low

17  level dealer?

18  A    I mean, you would just -- I would just say a quarter, and

19  typically if you say a quarter, they're going to think you're

20  talking about a quarter of an ounce.

21  Q    You mentioned previously that you had purchased not as

22  often as maybe you might have purchased more weight consistent

23  with, say, a low or mid level dealer, but you had purchased use

24  amounts before.

25          Based on your experience as an undercover, as

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   well as supervising confidential informants, what's the typical

2   price that someone might pay for that .2 grams, or somewhere

3   around that amount of crack cocaine?

4   A    I mean, typically, for a one use of crack cocaine you're

5   going to pay anywhere between -- and again, it's regional.  It

6   could be based on being in the city, the suburbs, but it's

7   going to be anywhere from 10 to $40.  I would say the average

8   is $20.

9   Q    Fair to say you've operated here in the Detroit area?

10  A    Yes.

11  Q    Based on your own experience here, what would be the

12  average price of approximately .2 grams?

13  A    $20.

14  Q    I want to somewhat as a whole wrap up your experience

15  here.  Can you estimate for the Court  approximately how many

16  undercover controlled purchases you have handled yourself?

17  A    Me personally, as the undercover purchasing narcotics, I

18  would say easily a couple hundred.

19  Q    All right.

20  A    I mean, I had some operations where I was doing it

21  multiple times a day for months on end.  The longest I've been

22  undercover is 11 out of 12 months away from home, so I would

23  say a couple hundred times, easily.

24  Q    When was the most recent time that you've purchased

25  narcotics yourself?

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1   A    Last time I actually purchased narcotics was in 2018.

2   Q    As a supervisory agent, are you still involved with the

3   management and outlining of plans of operations by your own

4   agents who are currently conducting these types of buys?

5   A    Yes.  For my team, I would be the on-scene commander.  I

6   would have to review all the operational plans, all the

7   reports, so I have to see what the plan is, and have to approve

8   that before we actually go out and do that operation.

9   Q    In an undercover capacity, how many times, if you can

10  estimate for the Court, please, have you sold -- fake drugs, of

11  course, but sold in a capacity as a low to mid-level dealer?

12  A    Well, they thought we were selling it, but we had to

13  arrest them, and that probably happened 10 to 15 times where I

14  have sold drugs and arrested the individual at the time of the

15  sale.

16  Q    And when was the most recent time that you've participated

17  in that form of operation?

18  A    That was much longer ago, and I would have to

19  approximately -- like 2014 maybe.

20  Q    Thank you.  Approximately how many times have you as the

21  agent in charge conducted a controlled purchase of narcotics by

22  a confidential informant?

23  A    That would also be a couple hundred.  I mean, I had a case

24  last year that I ran as a supervisor, where during one case I

25  at least had an informant make 45, approximately 45 purchases

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1   of narcotics from individuals.  And actually, during that

2   occasion, the informant that we were using was never a drug

3   dealer, so I actually had to talk him through how to actually

4   portray a drug dealer, what amounts to buy, because he just

5   wasn't comfortable with it.  But I mean, that alone was 45

6   times just last year as a supervisor, so I would say at least a

7   couple hundred.

8   Q    These controlled purchases involving criminal informants,

9   or confidential informants, rather, were any of them for the

10  purchase of crack cocaine?

11  A    Yes, absolutely.

12  Q    Have you ever been involved in the exchange of firearms

13  for drugs?

14  A    I have.

15  Q    And you yourself, when operating in an undercover

16  capacity, have you ever had to deal with people involved with

17  narcotics trafficking who also were doing this in conjunction

18  with possessing a firearm?

19  A    Most of the time, the individuals that I was purchasing

20  off of did possess firearms, not necessarily that I could

21  always see on their person, because sometimes those guns would

22  be hidden, but typically by the end of the investigation we

23  usually end it with a search warrant or a buy bust, and that's

24  when we would find firearms.

25                 ATF does not like to get involved in

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1   investigations that are not related to guns, but most of the

2   time the guys we're dealing with, they typically have firearms

3   when they're selling narcotics.

4   Q    Thank you.  You mentioned that during the course of your

5   career you've dealt with, I believe you said hundreds of

6   controlled substance users, is that correct?

7   A    Yes.

8   Q    Based on your personal experience interviewing users of

9   crack cocaine, debriefing confidential informants involving

10  crack cocaine buys, is it common for them to be in possession

11  of large amounts of currency?

12  A    No.

13  Q    What's your understanding as to why not?

14  A    It's, you know, based on my earlier testimony, as soon as

15  they get money, they're spending it on more drugs, because like

16  I said, crack cocaine, for instance, the high does not last

17  that long, but the effects of it make you want to get that high

18  again, so you're spending all of your money.  So every time

19  I've come in possession of users, whether it's typically

20  interviewing them at search warrants or just speaking with them

21  while I was in an undercover capacity at different store fronts

22  and stuff like that, I mean, these are people that don't have

23  money to buy a pack of cigarettes in the stores that I've been

24  in, where sometimes I'm giving it to them for free because they

25  just have nothing.

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1          I've ran into users that just to get narcotics

2    have actually had their teeth pulled.  I remember specifically

3    a female that had her entire top row of teeth pulled just so

4    she could go get a prescription for pills so she could go out

5    and use them and sell them.  So these are people that literally

6    have nothing in most cases.

7          Now, I'm sure there's exceptions to that rule,

8    but every single person that I've run into, it's typically the

9    same.

10   Q    When interacting with folks who have a struggle with the

11   use of crack cocaine, have you found it common that they're in

12   the possession of some form of use paraphernalia?

13   A    Yes.  Even running into a user that does not have

14   narcotics on their person, they typically always have either a

15   crack pipe, if crack is their drug of choice, they'll have a

16   needle if heroin is their drug of choice, again, a char boy if

17   crack is their drug of choice.

18          So typically, they're always going to have the

19   paraphernalia associated with the drugs they're doing.  They're

20   typically not going to leave the house, just like you wouldn't

21   leave the house without your wallet.

22   Q    Want to transition now to the other drug involved in this

23   case, which is powdered cocaine.  You've reviewed the materials

24   associated with this, is that fair?

25          THE COURT:  Mr. Smith, how long do you anticipate

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1    this is going to go?

2         MR. SMITH:  I would say my questioning, Your

3    Honor, would be maybe another 10 to 15 minutes.  And I beg

4    the Court's pardon, I thought Ms. Mannarino's request was

5    for just this, to establish his experience and training

6    and be able to portray to the Court his expertise.

7         THE COURT:  I've got another matter at 11:30.  I

8    can push that off to 12:00, but we've got to be done here

9    by 12:00.

10        MR. SMITH:  I will finish quickly, Your Honor.

11        MS. MANNARINO:  Judge, I'm prepared to make a

12   motion at this point that I appreciate the agent's

13   experience, but this doesn't have anything to do with this

14   case, and this is not anything that is not within the

15   purview of the jury to decide.  So, you know, bringing in

16   an expert under these circumstances to tell the jury

17   something that is within their purview to know and

18   understand, I think is inappropriate.  You know, this is

19   not an area for expert testimony.  The jury knows and

20   understands.

21        THE COURT:  Why don't you just make a proffer,

22   Mr. Smith, of what the testimony would be, and then we'll

23   have Ms. Mannarino make her motion.

24        MR. SMITH:  Certainly, Your Honor.

25        THE COURT:  We've still got the 404(b) one to

1   discuss, as well.

2              MR. SMITH:  Absolutely, Judge.  Would you like to

3   excuse the witness now?

4              THE COURT:  Yes.  You may be excused.

5              THE WITNESS:  Okay.  Thank you.

6              (Witness excused 10:56 a.m.)

7              MR. SMITH:  May I proceed?

8              THE COURT:  You may.

9              MR. SMITH:  Your Honor, as the testimony would

10  proceed, the government proffers that Special Agent Nether

11  would continue to outline for the Court that, where I was

12  going to specifically there, the powder cocaine itself,

13  one and-a-half grams, could arguably be for use amounts.

14  However, we were then going to transition into the

15  collective here, which is the one and-a-half grams of

16  powered cocaine, the seven and-a-half grams of crack

17  cocaine, the fact that it was individually packaged, that

18  it was concealed in conjunction with a firearm, that those

19  items were concealed specifically in Mr. Roberson's groin

20  area, and that, also, Mr. Roberson had over a thousand

21  dollars of U.S. currency on him.  Approximately $600 of

22  that was in $20 bills.

23              Special Agent Nether was then going to outline

24  that for the Court, and the reason why that's important,

25  Judge, is because the average juror, as the Sixth Circuit

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1    indicates, and contrary to what Ms. Mannarino says, does

2    not have this knowledge or experience.  It's outside of

3    the ken of the average juror; narcotics trafficking.

4    That's why the Sixth Circuit specifically has indicated

5    that drug trafficking experts are the type of expert that

6    has been overwhelmingly used in cases like this, and it's

7    because the average juror does not know about, two tenths

8    of a gram are use amounts for crack cocaine versus seven

9    and-a-half grams here that's one large chunk, that's

10   consistent with low to mid-level dealing.

11          So that is where Special Agent Nether's testimony

12   would go, Your Honor.

13          THE COURT:  Okay.  Thank you very much.

14          Ms. Mannarino.

15          MS. MANNARINO:  Again, I understand what the

16   prosecution is trying to do.  What they're trying to do

17   is, you know, convince a jury that this is something other

18   than what it is, and I think the case law, and I'm not

19   going to go through it, it's all in my motion, I trust the

20   Court has read it, I think the case law supports the fact

21   that this is exactly the type of information that is --

22   let me find -- where any probative value is substantially

23   outweighed by the danger of unfair prejudice and will lead

24   the jury to speculate and thus mislead the trier of fact.

25   Testimony as to such matters is not beyond the ken of the

Joseph Nether – Direct Examination
Thursday, June 30, 2022

1    jury and thus are not appropriate subject of expert

2    testimony.

3              THE COURT:  Mr. Smith.

4              MR. SMITH:  Thank you, Your Honor.

5              Your Honor, I would just outline briefly for the

6    Court the analysis under 702; specifically, when you're

7    talking about specialized knowledge such as what Special

8    Agent Nether has.

9              First, is the expert qualified?  I don't think

10   there's anything in dispute here about his qualifications.

11   Second is whether the proposed testimony is relevant.  And

12   third is whether the proposed testimony is reliable.  The

13   Sixth Circuit has indicated both -- a yes to both of those

14   questions.

15             Counsel mentions the case law.  I would note that

16   in counsel's brief, she relies on two cases from the

17   Second Circuit, one case from the Eighth Circuit.  All

18   three of them are 1991 or earlier, whereas the case that

19   the government relies on is Sixth Circuit case law from

20   the 2000s and the 1990s.

21             Judge, this is the type of case that an expert is

22   absolutely necessary.  That's why this circuit has held

23   that it's overwhelmingly admitted, because someone like

24   Special Agent Nether is able to tell 12 average members

25   from our community why 7.5 grams is more consistent with a

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1    low to mid-level dealer, as to someone who has a crack

2    cocaine use habit, why two stimulants packaged together is

3    different than maybe one hit of the drug by an average

4    user.

5            This isn't something that is going to mislead a

6    jury.  This testimony is actually going to illuminate all

7    of the details and the issues for the jury.  That's why

8    the Sixth Circuit has found this to be reliable and

9    relevant.

10           Thank you, Your Honor.

11           THE COURT:  Ms. Mannarino.

12           MS. MANNARINO:  In his experience, working in

13   certain areas, doing certain things, he is -- he's not

14   familiar with any users who are not desperate enough to

15   have their teeth pulled.  I mean, that type of testimony

16   is outrageous for the jury.  He has no familiarity with

17   any of the studies.  I understand and I appreciate his

18   experience on the streets of the City of Detroit, and who

19   he has encountered and why he and how he has encountered

20   them.  That's who he is going after for his confidential

21   informants, he's going after desperate people.

22           He doesn't have any experience and contact with

23   the over 50 percent of the users who are full-time

24   employees and work.  He doesn't have that kind of

25   experience.  His experience is all with, you know, people

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1    he -- he couldn't even pass as a drug user because he

2    looks too good.  He doesn't have any experience with, like

3    I said, the over 50 percent of drug users who are

4    full-time employed people.

5                THE COURT:  This is a slightly different argument

6    than the one you make in your brief.  The one you make in

7    your brief is that this area is an area that the jury can

8    access based on their own experience, not that Agent

9    Nether's experience and testimony is outside the factual

10   purview of this case.

11               I'm going to take this under advisement and get

12   something back to you next week.

13               MS. MANNARINO:  Thank you, Judge.

14               THE COURT:  Thank you.

15               And the 404(b)?

16               MS. MANNARINO:  I will rely on my motion and

17   brief.

18               THE COURT:  Okay.  Mr. Smith, do you want to say

19   anything?

20               MR. SMITH:  Your Honor, I think the only thing I

21   would outline is, again, the analysis sufficiently

22   occurred without any doubt.  Mr. Roberson pled guilty to

23   these prior offenses.  Is it for a proper purpose?  Yes

24   the intent.

25               I think what I would outline for the Court is,

Joseph Nether - Direct Examination
Thursday, June 30, 2022

1    again, Ms. Mannarino relied heavily on a Seventh Circuit

2    case where it talked about intent was not at issue in that

3    case and therefore it should not be admissible evidence.

4    But I'd like to highlight, in that case the defendant

5    declined any knowledge or possession of those drugs

6    entirely, and that specifically outlined that if the

7    defendant had said, well, they are mine, I just intended

8    to use them versus sell them, then intent would absolutely

9    be at issue, and that's exactly what we have here is that

10   intent is at issue because Mr. Roberson is arguing that

11   it's for personal use, and, of course, the government is

12   arguing that it's an intent to sell, Your Honor.

13           Thank you.

14           THE COURT:  Okay.  As with the first one, I'll

15   take it under advisement.  I'll get something out to you

16   next week at the same time I rule on the exclusion of

17   expert testimony, the Daubert motion.

18           Thank you, counsel.

19           MR. SMITH:  Thank you.

20           MS. MANNARINO:  Thank you.

21           (Proceedings concluded 11:04 a.m.)

22

23

24

25

1                          -   -   -

2

3                  **C E R T I F I C A T I O N**

4

5     I, Suzanne Jacques, Official Court Reporter for the United

6     States District Court, Eastern District of Michigan, Southern

7     Division, hereby certify that the foregoing is a correct

8     transcript of the proceedings in the above-entitled cause on

9     the date set forth.

10

11

12    s/Suzanne Jacques                        9/27/2022
      Suzanne Jacques, RPR, RMR, CRR, FCRR        Date
13    Official Court Reporter
      Eastern District of Michigan
14

15                          -   -   -

16

17

18

19

20

21

22

23

24

25